IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISCTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| **KIMBERLY D. ROE** | : | Civil Action No.: C-3-03-192 |
| Plaintiff, | : | Judge Walter H. Rice |
| vs. | : | |
| **DONALD H. RUMSFELD,** | : | **FIRST AMENDED COMPLAINT** |
| Defendant | : | **(Jury Demand Endorsed Hereon)** |

## NATURE OF COMPLAINT

1. This action arises under Title VII of the Civil Rights Act of 1964, as amended, U.S.C. 2000e et seq., providing for relief from discrimination in employment on the basis of race and sex, and prohibiting retaliation against individuals for opposing discrimination and unlawful practices. Defendant is being sued by a long time civilian employee of Wright Patterson Air Force Base ("WPAFB") in Fairborn, Ohio, for among other things, denying Plaintiff a well-deserved promotion on the basis of her race and sex. Plaintiff engaged in protected activity regarding Defendant's failure to promote her. Thereafter, Defendant, by and through its agents, and employees, retaliated against Plaintiff for engaging in protected activities and created a hostile work environment for Plaintiff.

## JURISDICTION AND VENUE

2. This court has subject matter jurisdiction of this compliant and the statutory claims pursuant to 28. U.S.C. § 1331 because this action arises under the Constitution and the laws of the United States

3. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because the primary unlawful actions complained of occurred at Wright Patterson Air Force Base located in the City of Fairborn, Greene County, Ohio.

4. Plaintiff Kimberly D. Roe filed charges of discrimination with the Equal Employment Opportunity Commission in 1999, 2000, 2001 and 2002. Plaintiff was advised of final agency action and thereafter, the original complaint was timely filed on May 30, 2003.

5. The court has jurisdiction under the doctrine of "continuing violations" with respect to Defendant's unlawful conduct beginning in 1999, and continuing to and through the date of this First Amended Complaint, because the past acts are related, and independently discriminatory and charges addressing those acts were themselves timely filed.

## PARTIES

6. Plaintiff Kimberly D. Roe ("Roe") currently is a civilian employee of the United States Department of Defense ("DOD") and is employed as a GS-326-05 at WPAFB. She is an African-American.

7. Defendant Donald Rumsfeld ("Rumsfeld") is the Secretary of the DOD and is named as a defendant in this action in his official capacity.

8. DOD is headquartered in Washington, DC and is an executive department of the Federal Government of the United States of America. As the head of DOD, Rumsfeld directs, approves, and/or is responsible for all official actions at DOD.

9. WPAFB is located in the State of Ohio and is a facility under the direction and control of Rumsfeld and DOD.

## FACTUAL BACKAGROUND

10. Plaintiff began working at the WPAFB Medical Center on June 27, 1993, in the Mental Health Flight (Life Skills Support Center) as a General Schedule (GS), Occupational Series 318, Grade 05, Secretary.

11. Plaintiff received "Superior Performance Ratings" on her Performance and Promotion Appraisal Evaluations ("Evaluations") from April 1993 to March 1994, April 1994 to March 1995, and April 1995 to March 1996. Plaintiff also received Awards for her performance and "Cash Awards" for outstanding work performance for three consecutive years.

12. In September 1996, Plaintiff was highly recommended and handpicked for an administrative position by Major Robert Campbell, the Family Advocacy Officer (FAO) and Staff Sergeant Jane Patrick, the Non-Commission Officer In Charge (NCOIC) of the Family Advocacy Program.

13. The Family Advocacy Program is an agency of the United States Department of Defense, governed by an Air Force Advocacy Program Standard, and designed to prevent and treat child and spousal abuse and to maintain a central registry of reports of alleged child and spouse abuse.

2

14. Since the Family Advocacy Program was a component of Mental Health Flight, Plaintiff was able to transfer laterally into the Family Advocacy Data Support Specialist (FADSS) administrative position. The Family Advocacy Program Manager for Wright-Patterson Air Force Base, is located at Brooks Air Force Base in San Antonio, Texas ("Brooks").

15. Plaintiff's job series changed from a General Schedule (GS), Occupational Series 318, Grade 05, (Secretary) to a General Skills (GS), Occupational Series 303, Grade 05 (Clerical Assistant) and her job title became the Family Advocacy Data Support Specialist (FADSS).

16. After several months, Plaintiff's immediate supervisor, Major Robert Campbell was transferred to another military installation and Lieutenant Colonel Michael E. Haynes (Caucasian) became Plaintiff's supervisor.

17. 1997, Lieutenant Franklyn D. Swayne (Caucasian) started working in the Family Advocacy Office under the supervision of Lieutenant Colonel Haynes, and later was promoted to the rank of "Captain".

18. In 1998 Lieutenant Colonel Haynes retired and Captain Swayne became the new Family Advocacy Officer in Charge and Plaintiff's immediate supervisor.

19. Plaintiff received ratings of "Superior" on her Evaluations while she was supervised by Major Campbell and Lieutenant Colonel Haynes.

20. Prior to 1997, Plaintiff had not experienced any medical problems requiring hospitalization or extensive time off from work due to illness. Plaintiff had an excellent work record and had accrued a balance of 627 sick leave hours.

21. Plaintiff underwent two medical procedures on June 13, 1997 and on June 26, 1997.

22. In March 1998, Plaintiff attended mandatory computer training at Brooks Air Force Base on how to operate the new Family Advocacy Data Automation Program ("FADAP") computer system, which was going to be installed at all Family Advocacy Program facilities.

23. As the Family Advocacy Data Support Specialist (FADSS), Plaintiff was assigned to be the "Super User" and representative from Wright-Patterson Air Force Base, to manage the Family Advocacy Data Automation Program (FADAP) computer system, and to be responsible for uploading maltreatment data to Brooks Air Force Base.

24. During the training, Plaintiff became aware of the possibility of the FADSS job positions being reclassified and upgraded.

25. Plaintiff experienced additional medical problems and on May 1, 1998, underwent a medical procedure and was discharged from the hospital on May 3, 1998.

26. When Plaintiff returned to work, none of her work assignments had been completed by her co-workers as was the case when similarly-situated co-workers were away on sick leave.

27. On October 6, 1998, Captain Swayne ordered Plaintiff to report to the Employee Assistance Office claiming that Plaintiff was having "personal problems". Captain Swayne directed Plaintiff to meet with Mr. Frank Burks (African-American), Employee assistance Office Manager.

28. On October 7, 1998, Plaintiff reported to the Employee Assistance Office and explained how Captain Swayne was treating her differently than other similarly-situated administrative staff employees. Plaintiff subsequently was advised to contact the Equal Employment Opportunity (EEO) Office and talk with Ms. Pamela McGinnis (African-American), a Union Steward with the American Federation of Government Employees Union (AFGE) Local 1138, regarding her right to protest Captain Swayne's unfair treatment.

29. On November 9, 1998, Plaintiff underwent two medical procedures, at Greene Memorial Hospital, in Xenia, Ohio.

30. Again, while Plaintiff was on sick leave, her assignments had not been reassigned.

31. In December 1998, Plaintiff was informed by a Family Advocacy Data Support Specialist at McCord Air Force Base, Seattle, Washington, that all FADSS job positions were being upgraded to an Occupational Series 186, Social Services Assistant, target grade GS-07.

32. Captain Swayne denied having any knowledge of the upgrade.

33. Despite repeatedly promising Plaintiff that he would contact Brooks Air Force Base to confirm the upgrade, Captain Swayne never did so.

34. On January 19, 1999, Plaintiff was informed by a Family Advocacy Data Support Specialist at Granforks Air Force Base, N.D., Brooks Air Force Base, was in the process of approving reclassifying and upgrading all FADSS job positions from a General Skills (GS) Occupational Series 303, grade 05 to a General Skills (GS) Occupational Series 186, grade 07, Social Services Assistant.

35. On February 24, 1999, Plaintiff accessed the Brooks Air Force Base Job Description website, and discovered that the new upgrade and reclassification of her position had

been approved and posted on the website. Plaintiff contacted Brooks Air Force Base to confirm that her position had been approved for upgrade and reclassification and was advised that each Family Advocacy Officer (Captain Swayne, in her case) would receive an authorization to submit to the Civilian Personnel Office.

36. From April 21st to April 30th 1999, Plaintiff took emergency leave to El Paso, Texas to attend the bedside of her brother who was then in a coma.

37. Again when Plaintiff returned to work, no one had completed her duties in her absence as was the case when similarly-situated co-workers were on leave.

38. In June 1999, Plaintiff underwent two additional medical procedures and was on sick leave until July 12, 1999. Again when Plaintiff returned to work, she found that no backup had been assigned and her work had stacked up.

39. On July 13, 1999, Captain Swayne requested a meeting with Family Advocacy Staff while she was on sick leave.

40. In the meeting Captain Swayne indicated that he did not believe Plaintiff was qualified or capable of handling her duties and did not know how to prioritize her work. He further said Plaintiff's work was behind and that she had too many visitors.

41. Plaintiff is informed and believes that the visitors that Captain Swayne referred to were Ms. Sarah Elliott (African American), Secretary for the Chief of Medicine Clinic, Master Sergeant Stacy Kirkendoll (African American), Non-Commissioned Officer In Charge of the Alcohol and Drug Abuse Prevention and Treatment Program and previous Non Commissioned Officer for the Family Advocacy Program, Chief Master Sergeant Charles McDaniel (African American), of the Defense Carrier Service, and Major Patricia Toles (African American), Chief of the Partial Hospitalization Program.

42. At the aforementioned meeting, Captain Swayne stated that he was keeping a "file" on Plaintiff and solicited assistance to watch Plaintiff. Captain Swayne asked Staff Sergeant Margaretta Glenn (African-American) Family Advocacy Non-Commission Officer in charge ("NCOIC"), to access the "file" while he was gone and document each time Plaintiff asked for help or assistance from other staff members.

43. On July 15, 1999, Plaintiff complained about Captain Swayne's actions to Mr. Frank Burks in the Employee Assistance Office. Plaintiff also complained to Chief Master

5

Sergeant Eddie Allen.  At Mr. Burks' suggestion Plaintiff complained to Lieutenant Colonel William Wall (African American), Chief of Social Work and Captain Swayne's supervisor.

44. Plaintiff complained to Lieutenant Colonel Wall, and then to Colonel Linda Griffith. about her treatment by Captain Swayne.   Plaintiff told them both that Captain Swayne was trying to stop her from receiving a promotion approved by Brooks Air Force Base.  No action was taken to prevent Captain Swayne from his hostile behavior towards Plaintiff.

45.  Plaintiff also complained to Chief Master Sergeant Eddie L. Allen (African-American), Mental Health Flight Superintendent.  At Chief Master Sergeant Allen's suggestion, Plaintiff complained to Colonel Linda Griffith (Caucasian), Mental Health Flight Commander, about her treatment by Captain Swayne. Plaintiff informed them both that Captain Swayne was trying to stop her from receiving a promotion approved by Brooks Air Force Base.  No action was taken to prevent Captain Swayne from his hostile behavior toward Plaintiff.

46. Captain Swayne became angry toward Plaintiff because she had reported him to senior management.  Thereafter, Captain Swayne engaged in a series of retaliatory actions against Plaintiff, including but not limited to:

    (a) On Tuesday, July 20, 1999, Captain Swayne demanded that Plaintiff attend a meeting in his office.  When Plaintiff reported to his office, Staff Sergeant Glenn was present.  Plaintiff told Captain Swayne that she requested her Weingarten Rights and wanted her union representative present.  Captain Swayne became angry and said he was going to contact Civilian Personnel.

    (b) On Friday, July 23, 1999, Captain Swayne came into Plaintiff's office and "Ordered" her to his office.  Plaintiff again requested her Wanguard Rights.  Captain Swayne denied Plaintiff's request and began to yell at Plaintiff  because she had reported him to her Chain of Command.  Captain Swayne then abruptly left Plaintiff's office.

    (c) Again on Tuesday, July 27, 1999 Captain Swayne ordered Plaintiff into his office.  Plaintiff requested her

6

>Weingarten Rights and he denied her request. Once Plaintiff was in Captain Swayne's office, he told her that the meeting was a counseling session. He stated that Plaintiff was behind in her work and effective that day, he was relieving Plaintiff from all her duties and assigning Plaintiff to sit at the front desk. He said her duties and responsibilities would be given to Ms. Leah Smith (Caucasian), administrative contractor employee.

47. After the meeting with Captain Swayne and Staff Sergeant Glenn, Plaintiff complained about Captain Swayne to the Employee Assistance Office. The following day July 28, 1999, Plaintiff met with her Union representative and set up an appointment to file a formal complaint with an Equal Employment Opportunity Counsel.

48. Captain Swayne became aware of Plaintiff's plan to file a complaint against him. Captain Swayne retaliated against Plaintiff and did everything in his power to hinder her from attending meetings with the Union and the Equal Employment Opportunity Office.

49. In August 4, 1999, Plaintiff filed an Equal Employment Opportunity (EEO) discrimination complaint against Captain Swayne for delaying her promotion by not submitting the paperwork to Civilian Personnel for processing and for demoting Plaintiff to the position of receptionist.

50. Following the filing of the EEO complaint, in 1999, Plaintiff experienced further serious medical problems and experienced further harassment from Captain Swayne including but not limited to:.

>(a) Repeatedly questioning the amount of time Plaintiff needed for sick leave even though Plaintiff always had the necessary documentation from her physicians, Captain Swayne would comment "Do you really need this much time off" and "You have to take off again?"
>
>(b) Whenever Plaintiff was on sick leave, Captain Swayne refused to assign a back-up person during her absences.
>
>(c) When Plaintiff would return to duty, he did not allow anyone to assist her, and she had to work long hours to get caught up. All

>    other similarly-situated Family Advocacy staff members had a back-up person assigned to do their work when they were absent
>
> (d) He violated the terms of a Mediation Agreement which purportedly resolved the 1999 EEO complaint, by calling a meeting for the purpose of and/or discussing at a meeting of Family Advocacy staff, the details of Plaintiffs complaint, to alienate her co-workers against her.

51. The workplace became so stressful that Plaintiff routinely came to work ill and tried to suppress her symptoms of chest pains, headaches, and exhaustion. Plaintiff's co-workers began taking their queue from management and started treating her adversely to similarly-situated employees.

52. In spite of the treatment Plaintiff received, Plaintiff never stopped performing her duties as the Family Advocacy Data Support Specialist while working under Captain Swayne.

53. In February 2000, after Captain Swayne transferred to Keesler Air Force Base, Mississippi, and Captain Damien McCabe (Caucasian) became the Family Advocacy Officer, and Plaintiff's first line supervisor.

54. Captain McCabe had worked for Captain Swayne as a Lieutenant, during the pendency of Plaintiff's 1999 EEO complaint against Captain Swayne.

55. Captain McCabe treated Plaintiff differently than her similarly-situated co-workers in that he enforced and pursued the same policy and practice of hostile and discriminatory treatment of Plaintiff as had been put in place by Captain Swayne.

56. On February 17, 2000, Plaintiff was admitted into Miami Valley Hospital for surgery and discharged on February 20, 2000. Plaintiff was on extended sick leave from February 11, 2000 to March 5, 2000.

57. At the end of March, Plaintiff became ill again and was placed on extended sick leave on March 21, 2000 through Friday, March 24, 2000. Plaintiff returned to work on Monday, March 27, 2000 but continued to be ill.

8

58. On March 30, 2000, Plaintiff was placed on extended sick leave from March 30, 2000 through April 7, 2000.

59. Plaintiff was on extended sick leave for major surgery from June 7, 2000 through July 28, 2000. On July 24, 2000, Plaintiff was placed on extended sick leave from July 24, 2000 through Friday, July 31, 2000.

60. In May 2000, while Plaintiff was on extended sick leave for major surgery, Captain McCabe was transferred to a military base in England. Captain McCabe was the Family Advocacy Officer for three (3) months. When he left WPAFB, Captain Gregory Postal (Caucasian), became the Family Advocacy Officer, and Plaintiff's first line supervisor.

61. Captain Postal had worked for Captain Swayne and Captain McCabe in the Family Advocacy Program as a Lieutenant and he and Plaintiff knew one another, before he became Plaintiff's first line supervisor and was one of the individuals with whom Captain Swayne discussed Plaintiff's 1999 EEO complaint in violation of the Mediation Agreement.

62. On Wednesday, December 20, 2000, Plaintiff filed an Equal Employment Opportunity complaint against Captain Postal for discrimination, reprisal, creating a hostile workplace and delaying her promotion and certain adverse actions, including but not limited to:

    (a) Captain Postal had a sign placed on the wall outside of Plaintiff's office door that read no one but Family Advocacy Staff were permitted to enter into Plaintiff's office. This action was taken in order to isolate Plaintiff, and not allow me to receive visitors nor have any type of contact with my co-workers from the Mental Health Flight staff; especially people of African American descent. No other staff member was similarly restricted.
During a Friday morning Matrix meeting between the Mental Health Flight Commander, Colonel Linda Griffith (Caucasian), and senior management, Major Patricia Toles raised her concerns about the sign posted outside of Plaintiff's office door prohibiting everyone but Family Advocacy staff to enter my office. Captain Postal did not remove the sign.

    (b) Captain Postal had Family Advocacy office staff monitor Plaintiff's telephone calls. Whenever Plaintiff received a

9

telephone call, it was reported to him by Family Advocacy staff. During staff meetings he would make references about Plaintiff's telephone calls. No other staff person had their telephone calls monitored.

(c) On July 24, 2000, while Plaintiff was on extended sick leave, Captain Postal created time constraint memoranda in which he associated unreasonable time limitations to Plaintiff's duties that were unreasonable to make it appear that Plaintiff was incompetent and unable to perform her duties. Captain Postal did not require other Family Advocacy administrative staff: Mrs. Jennie Camp (Pilipino) military spouse, Mrs. Monique Muncy (Caucasian) military spouse, Mrs. Stephanie Diaz (Hispanic) military spouse, Ms. Ruth Rozack (Caucasian), to have unreasonable time constraints on their specific duties.

(d) While Plaintiff was on extended sick leave, he scheduled meetings with staff members and advised them not to assist Plaintiff in any way and to not back-up when Plaintiff was absent from work because of illness or doctor appointments.

(e) As a form of punishment and in an attempt to make it difficult for Plaintiff, Captain Postal added an additional duty for Plaintiff to perform; assigned her to "man the front desk" four days a week for four and a half hours each day. He did this to limit Plaintiff's time spent to complete her other duties and assignments, in a timely manner. No similarly-situated co-worker was burdened in the same way.

(f) Captain Postal demanded that Plaintiff complete those tasks that had accumulated while on sick leave, in addition to her daily workload. He refused to provide assistance to complete the workload.

(g) At the direction of Captain Postal, at the end of each workday, Senior Airman Michael Tritt (Caucasian) would come and stand at

10

        Plaintiff's office door and say "Kimberly it is time for you to leave". Senior Airman Tritt would wait until Plaintiff would turn off her computer and then he would follow Plaintiff to the office hallway exit to ensure that Plaintiff could not stay late in order to get caught up with the workload.

63. While assigned to work at the front desk, Plaintiff did not have the freedom to go to the restroom or leave the unit, without ensuring that someone could cover the front desk. There were times that Plaintiff had to wait several hours before Plaintiff could get another staff member to cover the front desk so Plaintiff could use the restroom. This practice also prevented Plaintiff from attending meetings with union or EEO representatives.

64. On October 30, 2000, Captain Postal informed Plaintiff that he had the documentation approving her job position upgrade from Brooks Air Force Base. He then went before the Medical Center Committee to request an overage position so that "when Plaintiff was bumped" from her position, she would not have a slot to move into. Otherwise, Plaintiff would go "out the door."

65. Plaintiff met with Colonel Linda Griffith on Wednesday, November 1, 2000, and was assured that she should receive the promotion because Plaintiff had an excellent work history. She assured Plaintiff that she would look into the situation but did nothing.

66. On November 28, 200, Captain Postal conducted a performance feedback session with the Plaintiff, in the presence of Captain Michelle Loper , which did not accurately reflect Plaintiff's work performance.

67. In December 2000, Captain Postal transferred to a military base in San Diego, California. He had been Plaintiff's first line supervisor for four (4) months.

68. After Captain Postal's transfer, Captain Michelle Loper became the Family Advocacy Officer, and Plaintiff's first line supervisor and she continued the retaliation and harassment against Plaintiff

69. In January 2001, while Plaintiff and Ms. Ruth Rozack (Caucasian), Family Advocacy Program Assistant, were reviewing a document, Captain Loper entered the room and said to them, "I thought you were getting ready to kiss". The comment offended Plaintiff and contributed to a hostile work environment for Plaintiff.

70. On January 25, 2001, before the Family Maltreatment Case Management Team ("FMCMT") meeting held to review "Spouse Maltreatment Cases, Captain Loper made an inappropriate sexual comment about Plaintiff and Ms. Rozack by saying, " Next ya'll will be holding hands".

71. Captain Loper's comments offended Plaintiff and made her feel even more uncomfortable in the work environment because the comments implied that Plaintiff and Ms. Rozack were lesbians engaged in conduct of a sexual or romantic nature in the workplace.

72. On January 25, 2001 during the same FMCMT meeting, Ms. Joann Austin (Caucasian) Family Advocacy Treatment Manager, while describing a case of maltreatment stated about the victim, "[s]he is African-American and they have quite thick lips, so I can see how her lips would get cut". Such racial stereotyping being expressed by this co-worker further created a hostile work environment for Plaintiff especially when Plaintiff's supervisors said or did nothing to prevent the co-worker from making such comments.

73. Immediately after the meeting, Plaintiff sought to address these issues with Captain Loper and ultimately discussed them with Staff Sergeant Margaretta Glen.

74. On April 17, 2001, Plaintiff was directed to cover the front desk. Again, Plaintiff was aware that she could not leave the front desk even for a restroom break or any other activity without ensuring that someone covered for her. This restriction resulted in Plaintiff losing control of her bodily functions and having an accident on herself before she could get to the restroom.

75. On May 3, 2001 Staff Sergeant Margaretta Glenn handed out Civilian Performance Appraisal Evaluations ("Evaluations") for the April 2000 through March 2001 annual rating cycle, to all other of Plaintiff's co-workers.

76. Upon Plaintiff's inquiry about her Evaluation:
  (a) Glenn advised that it had been returned to Master Sergeant Stacy Kirkendoll ("Kirkendoll");
  (b) Kirkendoll advised that it had been turned over to Ms. Robyn Hopfele (Caucasian) in the medical center Resource Management Office ("Hopfele");
  (c) Hopfele advised that the Evaluation was given to Major Margaret Kohut, (Caucasian) Captain Loper's supervisor ("Kohut");
  (d) Kohut informed Plaintiff that he did not have Plaintiff's Evaluation;

12

    (e) When she returned on May 14, 2001, Captain Loper advised that she did not know where the Evaluation was;

    (f) On May 22, 2001, Captain Loper handed Plaintiff an unofficial evaluation with undeservedly low ratings and without names but without names of raters or their signatures;

    (g) Simultaneously with handing Plaintiff an unofficial evaluation, Captain Loper issued an underserved Oral Admonishment because Plaintiff had installed the Family Advocacy System Of Record computer system on her computer some two months earlier;

    (h) While making repeated excuses, Captain Loper withheld Plaintiff's Evaluation for another six (6) months. The Evaluation was provided on September 11, 2001;

    (i) Contrary to Air Force regulations, Captain Loper submitted Plaintiff's Evaluation to the Office of Civilian Personnel without allowing Plaintiff the opportunity to review and sign the Evaluation and file a grievance as to any disagreements with her performance ratings.

77. On July 10, 2001, one day before a scheduled major surgery, Plaintiff learned that Captain Loper was advertising to fill Plaintiff's position.

78. Upon contacting the Resource Management Office, where the job advertisement was posted on the bulletin board, Plaintiff learned that Captain Loper had advertised to fill Plaintiff's position at the upgrade to GS 07 which upgrade Captain Loper had denied Plaintiff.

79. On July 12, 2001, while on extended sick leave as a result of major surgery, Plaintiff learned that without her knowledge or consent, she had been placed on Leave Without Pay, because she had exhausted her leave.

80. WPAFB maintains a Leave Transfer Program under which employees are allowed to donate their sick leave to a co-employee who has exhausted their annual leave. Plaintiff sought Captain Loper's approval to participate in the Leave Transfer Program.

81. On August 27, 2001, Plaintiff learned that Captain Loper disapproved her request for advance sick leave. As a result, Plaintiff lost several hundred dollars in wages for that pay period.

13

82. On September 21, 2001, Plaintiff contacted a Staffing Specialist in the CPO to find out how her position could have been advertised internally for a "fill action" while she was still in it. Plaintiff eventually was advised that in contravention of the usual procedures, hers was a "special case" in which management could do as it pleased. Plaintiff was not given the opportunity to compete for her position internally.

83. On October 1, 2001 Plaintiff became ill when she learned that her job position had been posted externally. She submitted an Optional Application for Federal Employment but was never contacted to be interviewed and thereby was denied the opportunity to compete for the position.

84. On October 16, 2001, Plaintiff interviewed for a Grade 06 secretary position, a promotion opportunity for Plaintiff. The interview took a turn for the worse when it was noticed that throughout her career, Plaintiff had received "Superior" ratings until she received the low ratings for the April 2000 to March 2001 rating period. The interviewer contacted Captain Loper. Plaintiff was not selected for the position. Subsequently, Plaintiff learned that the position was twice offered to a similarly-situated Caucasian co-employee and that it was eventually filled by yet another similarly-situated Caucasian co-employee.

85. Plaintiff is informed and believes that in November 2001, Captain Loper interviewed candidates for her position that had been advertised externally, sometimes in plain view of Plaintiff. Later that month, Plaintiff's telephone was removed from her desk and telephone lines were rearranged in anticipation of a new employee.

86. On the same day, Plaintiff learned that Captain Loper had approved the Leave Transfer Program application but refused to sign the eligibility analysis form. Thus, Plaintiff's Leave Transfer Program Package was not forwarded to Civilian Personnel until October 5, 2001.

87. During this period, Plaintiff attempted to meet with Brigadier General Joseph Kelley to describe the hostile environment within which she worked. Plaintiff was informed by General Kelley's secretary that the General would not meet with Plaintiff because she had filed an EEO complaint.

88. On November 6, 2001 after her pleas went unheeded, Plaintiff sent an e-mail to Air Force Materiel Commander, General Lester Lyles, seeking his assistance. Despite a return e-mail promising to look into Plaintiff's concerns, Plaintiff never heard from General Lyles.

89. On November 28, 2001, Plaintiff was ordered to report to Captain Loper's office. When she arrived, Staff Sergeant Margaretta Glenn was present. Plaintiff attempted to invoke her Weingarten rights but was denied. Captain Loper proceeded to inform Plaintiff that she had hired "a retired Chief Master Sergeant" to fill Plaintiff's position. Therefore, Plaintiff was ordered to man the front desk and forced to perform receptionist duties.

90. Plaintiff requested full documentation of the change in classification and change in condition of employment. Plaintiff was never provided any official documentation from Captain Loper or Civilian Personnel.

91. On November 30, 2001, Plaintiff was informed by Ms. Lavelle Davenport (African-American) of the Civilian Personnel Office that her Leave Transfer Package had been approved, but that only Captain Loper could be responsible for coordinating leave donations from Plaintiff's co-workers.

92. Ms. Davenport served as the advisor for Management when Plaintiff filed her 1999 EEO complaint against Captain Swayne.

93. Contrary to Ms. Davenport's assertions, Plaintiff had received numerous e-mail solicitations from Robyn Hofele with respect to other medical center employees similarly-situated to Plaintiff, and not under Ms. Hofele's supervision.

94. It was not until December 12, 2001, that Civilian Personnel disseminated Plaintiff's request throughout WPAFB. Plaintiff thus lost valuable time in which she could have been receiving leave donations.

95. On December 19, 2001, Plaintiff was given a "Notification of Change of Duty Assignment" from Captain Loper stating that effective January 2, 2002, Plaintiff would no longer be assigned to the Family Advocacy Program and that she was being sent to work in the Alcohol and Drug Abuse Prevention and Treatment ("ADAPT") Program.

## Count One:
### Hostile Work Environment

96. Plaintiff incorporates by reference paragraphs 1 through 95 above as if fully restated herein.

97. Plaintiff was subjected to continuous harassment by each of her successive supervisors; Captain Swayne, Captain McCabe and Captain Loper.

15

98. The harassment to which Plaintiff was subjected was, and continues to be severe, pervasive and abusive above that which a reasonable person should be made to endure.

99. Plaintiff's complained to the supervisors of her immediate supervisors and to other senior management of Defendant.

100. Defendant was aware of Plaintiff's charges of harassment and of hostile working environment.

101. Despite repeated opportunities to do so, Defendant failed to take corrective action.

102. Defendant's conduct violates Title VII of the Civil Rights Act of 1964, as amended.

103. As a direct and proximate result of Defendant's unlawful employment actions, Plaintiff has been damaged and is entitled to compensatory damages in an amount to be determined at trial, but being not less than One Hundred Thousand Dollars ($100,000).

## Count Two:
## Racial Discrimination

104. Plaintiff incorporates by reference paragraphs 1 through 103 above as if fully restated herein.

105. Plaintiff is a member of two protected classes under Title VII of the Civil Rights Act of 1964, as amended; to wit: African-American and female.

106. At all times material hereto, Plaintiff was the only African-American employed at the Family Advocacy Program at WPAFB.

107. Defendant, by and through its agents and employees, has treated or allowed Plaintiff to be treated adversely to similarly-situated employees who are outside the protected group contemplated in Title VII of the Civil Rights Act of 1964, as amended.

108. Such adverse treatment was based on Plaintiff's race.

109. As a direct and proximate result of Defendant's unlawful employment actions, Plaintiff has been damaged and is entitled to compensatory damages in an amount to be determined at trial, but being not less than One Hundred Thousand Dollars ($100,000).

## Count Three:
## Retaliation

110. Plaintiff incorporates by reference paragraphs 1 through 109 above as if fully restated herein.

111. Plaintiff filed numerous Equal Employment Opportunity complaints and complained to management at WPAFB in regard to the incidents of harassment, the hostile work environment and the racial discrimination she experienced at the Family Advocacy Program.

112. The filing of internal grievances and complaints and the filing of Equal Employment Opportunity complaints, are protected activities within the meaning of Title VII of the Civil Rights Act of 1964.

113. Plaintiff's exercise of her Civil Rights were known by Defendant through its agents and employees.

114. Shortly after Defendant's agents and employees were made aware of Plaintiff's exercise of her Civil Rights, Defendant took adverse employment actions against Plaintiff by, among other things, failing to upgrade Plaintiff's position and/or to promote her.

115. Defendant's adverse actions in regard to the terms and conditions of Plaintiff's employment were causally connected to the protected activity engaged in by Plaintiff.

116. As a direct and proximate result of Defendant's unlawful employment actions, Plaintiff has been damaged and is entitled to compensatory damages in an amount to be determined at trial, but being not less than One Hundred Thousand Dollars ($100,000).

## Count Four:
## Intentional Infliction of Severe Emotional Distress

117. Plaintiff incorporates by reference paragraphs 1 through 104 above as if fully restated herein.

118. Defendant owed a duty to Plaintiff to refrain from intentional injury to Plaintiff.

119. Defendant, by and through its agents and employees, breached its duty to Plaintiff.

120. As a direct and proximate result of Defendant's breach of duty, Plaintiff has suffered injury in the form of, severe stress, embarrassment, humiliation, emotional distress, loss of reputation, loss of self-esteem, harm to Plaintiff's relationship with her family, and physical injury in the form of other adverse health effects. Plaintiff is therefore entitled to damages in an amount to be determined at trial, but being not less than One Hundred Thousand Dollars ($100,000).

## Requests For Relief

**WHEREFORE,** Plaintiff respectfully requests that this Court enter judgment for Plaintiff and against the Defendant as follows:

    a)    As to Count One, damages in an amount to be determined at trial, but being not less than One Hundred Thousand Dollars ($100,000);

    b)    As to Count Two, damages in an amount to be determined at trial, but being not less than One Hundred Thousand Dollars ($100,000);

    c)    As to Count Three, damages in an amount to be determined at trial, but being not less than One Hundred Thousand Dollars ($100,000); and

    d)    As to Count Four, damages in an amount to be determined at trial, but being not less than One Hundred Thousand Dollars ($100,000);

    e)    An award to Plaintiff of attorney's fees and for cost of suit; and

    f)    An award of such other relief as the Court may deem just and proper.

Respectfully submitted,

**LAW OFFICES OF CHARLES A. MCKINNEY**

_/s/ Charles A. McKinney_
Charles A. McKinney (# 0039214)
20 West Monument Ave.
Dayton, OH 45402
Phone: (937) 461-9000
Fax: (937) 461-9640
Attorney for Plaintiff, Kimberly Roe.

**JURY DEMAND**

Plaintiff hereby requests a trial by jury on all matters which may be tried to a jury.

_/S/ Charles A. McKinney_
Charles A. McKinney
Attorney for Plaintiff

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document was served via electronic filing to Gregory P. Dunsky, Esq., Assistant United States Attorney, gregory.dunsky@usdoj.gov, this 3rd day of May, 2005.

/S/ Charles A. McKinney
Charles A. McKinney

18